# United States Court of Federal Claims

Nos. 09-60 C & 09-323 C
(Filed Under Seal: May 28, 2009)
(Reissued: June 8, 2009)[1]

_____

**ViroMed Laboratories, Inc.,**

      *Plaintiff,*

v.

**United States of America,**

      *Defendant,*

**and**

**Center for Disease Detection,**

      *Intervenor.*

Bid Protest; Preliminary Injunction; Civil Contempt.

_____

*David H. Laufman*, Kelley Drye & Warren LLP, Washington, DC, for plaintiff.

*Michael D. Snyder*, United States Department of Justice, Civil Division, Washington, DC, for defendant.

*Donald T. Bucklin*, Squire Sanders and Dempsey LLP, Washington, DC, for intervenor.

## OPINION and ORDER

**Block,** *Judge.*

### I. INTRODUCTION

Currently before this court are plaintiff's motion to impose contempt sanctions on the government and its application for a Rule 65 preliminary injunction in a bid protest action.[2] Indeed,

---

[1] This opinion originally was issued under seal on May 28, 2009. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication. One redaction was proposed and accepted. Accordingly, the opinion is herein reissued for publication, unsealed.

[2] Plaintiff's complaint was drafted and filed as a pre-award bid protest. However, as recounted below, defendant awarded the contract at issue to intervenor mere hours after plaintiff's filing. *See* Def.'s Notice at 1.

this is the second time these parties have graced this court's doorstep in a dispute over Navy contract awards for HIV testing services. Plaintiff's first bid protest[3] was dismissed without prejudice after the court issued an order reflecting the parties' apparently successful settlement discussions. *ViroMed I* Dismissal Order. The Navy then awarded a bridge contract to intervenor, Center for Disease Detection ("CDD"), for the purpose of procuring HIV testing services until it could implement the corrective action in the court's dismissal order and award a longer-term contract. Hanger Decl. ¶ 3. In the instant bid protest, plaintiff argues that the solicitation and award of the bridge contract was the product of bad faith, *ViroMed II* Compl. ¶¶ 26–28, and asks the court for a preliminary injunction until the court can rule on the merits of the protest, Pl.'s App. at i. Plaintiff also complains that the solicitation and award was a violation of this court's dismissal order for which this court should hold defendant in contempt. Pl.'s Enforcement Mot. at 4–5. For the reasons set forth below, this court denies both plaintiff's motion for contempt and its application for a preliminary injunction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On April 18, 2007, the Navy issued RFP N00189-07-R-Z027 ("RFP") for the procurement of: "Human Immunodeficiency Virus (HIV) Type 1 + 2 screening[4] and confirmatory testing . . . to detect [HIV] antibodies or viral proteins in specimens provided by Naval Submitting Activities worldwide and/or blood program donors." RFP at 1, 3. The contract awardee would provide these testing services from February 1, 2008 (or the date of contract award) to September 30, 2008, with four one-year options. RFP at 3–12, 18. The contracting officer and the contact negotiator for the RFP were Ms. Leanne Hanger and Ms. Mary Mezzatesta, respectively. Hanger Decl. ¶ 2; RFP at 1. It was the participation of Ms. Hanger and Ms. Mezzatesta in the later solicitation for the bridge contract that is in part the basis of the instant motion for contempt and application for a preliminary injunction. *ViroMed II* Compl. ¶¶ 26–28; Pl.'s Enforcement Mot. at 4–5.

Plaintiff, the incumbent contractor,[5] submitted a proposal on November 1, 2007. Fogerson Decl. ¶¶ 3, 5. On October 2, 2008, the Navy informed plaintiff that it had awarded the contract to CDD. Fogerson Decl. ¶ 6. On October 20, 2008, plaintiff filed a protest at the Government Accountability Office ("GAO") alleging that "the [Navy] improperly considered an unstated evaluation criterion in evaluating its proposal, and that the [Navy's] source selection decision was

---

[3] For the purposes of clarity, the court will refer to ViroMed's February 2, 2009 bid protest action (09-60) as *ViroMed I* and the instant bid protest action (09-323) as *ViroMed II*.

[4] HIV-1 is the primary type of the human immunodeficiency virus, while HIV-2 is a subsequently discovered type of the virus predominantly found in Africa. CENTERS FOR DISEASE CONTROL AND PREVENTION, HUMAN IMMUNODEFICIENCY VIRUS TYPE 2 at 1 (1998), http://www.cdc.gov/hiv/resources/factsheets/PDF/hiv2.pdf. Genetic differences between the two types of HIV require the use of different, type-specific proteins in the antibody assays to ensure reliable detection of both types of the virus. BIO-RAD, MULTISPOT HIV-1/HIV-2 RAPID TEST 3 (2004), http://www.fda.gov/cber/pmalabel/p040046LB.pdf. Thus, HIV-1 screening tests only reliably detect HIV-1, while HIV-1/2 screening tests effectively detect both HIV-1 and HIV-2. *Id.*

[5] Plaintiff was providing HIV-1 testing services only. Fogerson Decl. ¶¶ 3–4.

based improperly on price [alone]." *ViroMed Labs, Inc.*, Comp. Gen. B-310747.4, 2009 CPD ¶ 32, at 1, 4. The GAO denied this protest on January 22, 2009. *Id.* at 7.

Plaintiff then filed a complaint with this court on February 2, 2009, alleging, among other things, that Navy contracting officials exhibited prejudice against plaintiff and accorded CDD preferential treatment. *ViroMed I* Compl. ¶¶ 31–36. Plaintiff claimed that the award of the contract to CDD was part of an ongoing effort in a far-reaching campaign to strip HIV testing services from ViroMed.[6] *See ViroMed I* Pl.'s Mot. to Supp. Admin. R. at 10–11.

After settlement negotiations, the parties filed a Consent Stipulation of Dismissal and Notice of Corrective Action ("Consent Stipulation"), along with a proposed Order of Stipulated Dismissal, on March 26, 2009. Consent Stipulation at 1, 5. After discussing the Consent Stipulation with the parties, the court issued the parties' proposed order ("Dismissal Order") on March 31, 2009 and directed the Clerk of Court to dismiss the case without prejudice. Dismissal Order at 1, 3. Pursuant to the parties' agreement, the Dismissal Order stated:

> WHEREAS, the parties to the above-captioned matter have agreed to dismiss this matter for the reasons set forth in the parties' CONSENT STIPULATION OF DISMISSAL AND NOTICE OF CORRECTIVE ACTION (the "Stipulation of Dismissal"), including the Navy's agreement to take the corrective actions specified therein; and
>
> WHEREAS, the Navy agrees to submit to this Court's jurisdiction for purposes of enforcing this Order;
>
> It is hereby ORDERED that, [t]he Navy shall take the following corrective action:
>
> > a. A new technical evaluation board ("TEB") and new contract negotiator and contracting officer will be assigned to the procurement. Each member of the TEB will execute a Conflict of Interest and Nondisclosure Agreement, a blank copy of which has been provided to the parties and the Court.
> >
> > b. No revisions will be made to the solicitation evaluation criteria and the solicitation will remain unrestricted.

---

[6] Plaintiff's evidence of this alleged bad faith included: (1) the declaration of one of its employee's containing the hearsay statements of a Navy employee involved in the solicitation; (2) a letter from former Representative Curt Weldon to the Secretary of the Navy encouraging the Navy to designate the "upcoming . . . HIV testing services solicitation as a small business set-aside"; (3) a copy of CDD President Carlos Roca's recent campaign contributions to Rep. Weldon; and (4) newspaper articles tying Rep. Weldon to federal corruption charges. *ViroMed I* Pl.'s Mot. to Supp. Admin. R. Exs. A–G. Plaintiff also highlighted what it termed "unexplained" increases in the Navy's evaluation of CDD's technical proposal. *ViroMed I* Pl.'s Mot. to Supp. Admin. R. at 10–11.

        c. The competitive range will consist of ViroMed and CDD.

        d. The new TEB will evaluate the existing proposals of Viromed and CDD; *i.e.*, the initial technical proposals; communications from CDD and ViroMed, by email or otherwise, made during discussions that are included in the record; and the revised proposals of August 2008.

        e. The new contracting officer will initiate and conduct discussions with ViroMed and CDD. Such discussions will include, but not be limited to, the subject of innovations.

        f. Following discussions, the Navy will give both offerors an opportunity to revise any aspect of their proposal, without restriction, and final proposal revisions (FPRs) will be requested.

        g. After the Navy's receipt of FPRs, the new TEB will evaluate the revised technical proposals from ViroMed and CDD, and the new negotiator/contracting officer will evaluate the revised price proposals.

        h. The new contracting officer will make a source selection decision based upon the new revised proposals submitted and the evaluation criteria set forth in the solicitation.

Dismissal Order at 1–2.

      Throughout the pendency of its protests before GAO and this court, plaintiff continued to provide uninterrupted HIV-1 testing services to the Navy under its original contract and a series of "extensions,"[7] the most recent of which is set to expire on May 31, 2009. Fogerson Decl. ¶ 9; Hanger Decl. ¶ 3. On May 8, 2009, the Navy issued RFQ N00189-09-T-Z080 ("RFQ") for purposes of awarding a "bridge" contract for HIV-1 testing services from June 1, 2009 through July 31, 2009, with two one-month options. RFQ at 1–7. The bridge contract would continue to provide the Navy with HIV testing services until the Navy could implement the aforementioned corrective action and award a longer-term contract pursuant to the RFP. Hanger Decl. ¶ 3. As was the case with the initial RFP, the contracting officer for the RFQ was Ms. Hanger and the contact negotiator was Ms. Mezzatesta. Hanger Decl. ¶ 3; RFQ at 1.

      On May 11, 2009, ViroMed Vice-President Robert Fogerson learned that Bio-Rad Laboratories, Inc. ("Bio-Rad"), the only available supplier of HIV-1 testing kits, had only enough inventory on hand to support the Navy's requirements through June 2009. Fogerson Decl. ¶ 11. On May 12, 2009, and again on May 13, 2009, Mr. Fogerson informed the Navy of this shortage.

---

[7] The parties dispute the nature of these "extensions," as discussed below.

Fogerson Decl. ¶¶ 11–12; Hanger Decl. ¶ 4.  In response to this new information, the contracting officer immediately amended the RFQ to extend the due date for quotations to May 15, 2009. Amendment 0001 at 2.  On May 14, 2009, the contracting officer amended the RFQ a second time to include HIV-1 testing only through June 2009, and HIV-1/2 testing from July 2009 forward. Amendment 0002 at 2–4.  Meanwhile, unbeknownst to the Navy, plaintiff purchased Bio-Rad's entire uncommitted stock of HIV-1 testing kits.  Fogerson Decl. ¶ 12.

On May 15, 2009, plaintiff submitted a timely response to the RFQ with an accompanying cover letter informing the Navy that it had "purchased the entire stock of . . . HIV-1 test kits required by the [RFQ]."  Pl.'s Ex. 3 at 1.  CDD also submitted a quotation which included HIV-1 testing. Hanger Decl. ¶ 4.  The contracting officer then contacted Bio-Rad and confirmed that plaintiff had, indeed, purchased Bio-Rad's entire stock of uncommitted HIV-1 testing kits.  Hanger Decl. ¶ 4.

That same day, plaintiff attempted to file a Motion for Order to Show Cause ("Enforcement Motion" or "Pl.'s Enforcement Mot.") in hard-copy under the closed *ViroMed I* case[8] as to "why the [defendant] should not be held in contempt of this [c]ourt's [Dismissal Order]."  Pl.'s Enforcement Mot. at 1, 5.  Due to a quirk of this court's filing system, which requires that all filings in bid protests be filed electronically, plaintiff received an electronic defect notification that its hard-copy filing was rejected.  *ViroMed I*, 09-60C Docket.  The upshot of this confusion was that this court did not receive plaintiff's Enforcement Motion until May 19, 2009.  *ViroMed I*, 09-60C Docket.

In the Enforcement Motion, plaintiff asserted that defendant violated the Dismissal Order by allowing Ms. Mezzatesta and Ms. Hanger to participate in the RFQ.  Pl.'s Enforcement Mot. at 4–5. Plaintiff also requested an expedited hearing on the matter.  Pl.'s Enforcement Mot. at 1. Accordingly, the court scheduled a status conference with the parties for May 21, 2009.  *ViroMed I*, Status Conf. Order, May 20, 2009.

On May 19, 2009, the same day that this court received plaintiff's Enforcement Motion, the Navy issued a third amendment to the RFQ.  Amendment 0004 at 1.[9]  This amendment removed the requirement for HIV-1 testing, in favor of HIV-1/2 testing for the duration of the bridge contract, and set a due date for quotations of May 20, 2009 at 4:00 pm.  Amendment 0004 at 2–3.

On May 20, 2009, plaintiff filed the instant bid protest, accompanied by an Application for a Temporary Restraining Order and Preliminary Injunction ("Application for a Preliminary Injunction" or "Pl.'s App.").  *ViroMed II* Compl. at 10.  In its complaint, ViroMed charges that the RFQ's amendments illustrate Ms. Hanger and Ms. Mezzatesta's ongoing bias in favor of CDD, thus prejudicing ViroMed.  *ViroMed II* Compl. ¶¶ 5, 8–28.

---

[8] Plaintiff apparently believed that the ECF system would not allow it to file a motion electronically in a closed case.

[9] This amendment is numbered "0004," but the parties do not dispute that it was only the third amendment.

This court held a status conference with the parties on May 21, 2009 to discuss how to proceed with plaintiff's Enforcement Motion and Application for a Preliminary Injunction. During that status conference, defendant informed the court that the Navy had awarded the bridge contract to CDD at some point the previous evening. Defendant and intervenor further insisted, stressing the public health concerns of Navy service members, that the Navy could not extend the contract for HIV-1 testing services that plaintiff was currently performing, which was due to expire on May 31, 2009. These concerns prompted the court to immediately schedule a hearing for the following day at 2:00 pm. *ViroMed I*, Order Summarizing Status Conf., May 21, 2009.

At the hearing the next day, this court announced it would, due to the time-sensitivity of the issues before it, rule from the bench on both the Enforcement Motion and the Application for a Preliminary Injunction, with a written opinion encompassing both motions to follow. (Tr. at 5, 40, 94–97). Ultimately the court declined to hold defendant in contempt and denied plaintiff's Application for a Preliminary Injunction. (Tr. at 40, 96). Today, the court issues its promised opinion in support of these rulings.

### III. DISCUSSION

**A. Plaintiff's Motion for Contempt**

In its Enforcement Motion, plaintiff argues that Ms. Mezzatesta and Ms. Hanger's involvement with the RFQ for the bridge contract contravenes this court's Dismissal Order in *ViroMed I*, and contends that those officials' participation is such "a clear and flagrant violation of the Dismissal Order" that this court should hold defendant in contempt. Enforcement Mot. at 3. Plaintiff reads the Dismissal Order, which is based on its Consent Stipulation with defendant and intervenor, as barring those officials' involvement with *any* solicitation for the provision of HIV-1/2 testing services. *Id.* at 4–5 & n.2; (Tr. at 15, 38). According to plaintiff, there was no question at the time of the Dismissal Order that it was not restricted to the RFP in *ViroMed I*, and asserts that any contrary interpretation can only be specious. *Id.*; (Tr. at 16–17, 23). This is so, plaintiff contends, because ViroMed would never have entered into the Consent Stipulation if it only applied to the RFP in *ViroMed I*. *Id.* When the court inquired whether this was an argument based on the violation of the "spirit" of the court's Dismissal Order, and not one based on the actual text of that document, plaintiff's counsel seemingly agreed, arguing that the "spirit" of the Dismissal Order was not just violated, but "gored," or "eviscerated."[10]

To prove contempt, plaintiff here has a difficult row to hoe. It is beyond cavil that the standard of proof is one of clear and convincing evidence, *see Yancheng Baolong Biochem. Prods.*

---

[10] THE COURT: "So basically, your argument is that, if I can use that, the spirit of the Court's order wasn't precisely violated?"

MR. LAUFMAN: "I don't think the word 'spirit' fully captures it. But to the extent that you have question about whether the letter of the agreement was violated, because that was a different RFP — even if it dealt with precisely the same subject matter at issue here, then I would say maybe, yes, the spirit was not violated. It was gored. It was eviscerated, sufficient to make a nullity of this Court's order." (Tr. at 21–22).

*v. United States*, 406 F.3d 1377, 1381 (Fed. Cir. 2005); *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1572 (Fed. Cir. 1997), which is a "demanding burden of proof," *Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700, 704 (2009) (citing *Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 803 F.2d 1170, 1172 (Fed. Cir. 1986)).  To establish contempt, the movant "must demonstrate that: (1) the offending party violated an order of the court; (2) the violation was more than *de minimis* or technical noncompliance; and (3) the conduct was not the product of a good faith or reasonable interpretation of the order." *Navajo Nation v. Peabody Coal Co.*, 7 Fed. App'x 951, 955 (Fed. Cir. 2001) (citing 7 James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE ¶ 37.51[7][b] (3d ed.1999)).  Thus, a court cannot hold a party in contempt if there is "'a fair ground of doubt as to the wrongfulness of [that party]'s actions.'" *Yangcheng*, 406 F.3d at 1381 (quoting *Preemption Devices*); *Navajo Nation*, 7 Fed. App'x at 955 (same); *see MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co.*, 767 F.2d 882, 885–86 (Fed. Cir. 1985) (declining to secondguess the trial court's finding "fair ground of doubt" as to whether the movant established "*prima facie* contempt"); *see also Savantage*, 86 Fed. Cl. at 704 (quoting *Patent Crusher & Pulverizer*).

      Plaintiff has provided less than even a preponderance of the evidence, let alone shown the clear and convincing evidence required for this court to hold defendant in contempt.  (Tr. at 40). Nothing in plaintiff's arguments or filings convinces this court that defendant has actually violated this court's Dismissal Order by allowing Ms. Mezzatesta and Ms. Hanger to participate in the RFQ for the bridge contract.

      Contrary to plaintiff's invitation that the court look beyond the pertinent text of its Dismissal Order to that document's spiritual penumbra, it is almost a truism that to determine whether its orders and processes have been violated, a court must begin with the plain meaning of the language at issue.  *See Navajo Nation*, 7 Fed. App'x at 955 (holding that the court cannot hold a party in contempt without first determining that the party violated a court order and that the violation was not a good faith or reasonable construction of the order).  Furthermore, as here, when a court incorporates a settlement agreement into an order of dismissal (whether *in toto* or by reference), the terms of that agreement become relevant to the court's enforcement of its own order.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994).  So embodied, the court will typically interpret such an order using principles of contract interpretation.  *See Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998); *Verschoor v. Schuyler Labs., Inc.*, 131 F.3d 1016, 1020 & n.1 (Fed. Cir. 1997) (using state contract law in enforcing court's order incorporating a settlement agreement).

      It is facially clear that this court's Dismissal Order, which embodies the parties' agreement to voluntarily dismiss *ViroMed I*, neither mentions nor references the RFQ or any future bridge contract in its text.  *See* Dismissal Order at 1–2.  The plain meaning and clear text of the Dismissal Order do not reference anything other than the solicitation for the long-term provision of HIV-1/2 testing services in *ViroMed I*. *Id.*  Thus, paragraphs (b) and (h) refer to "the solicitation evaluation criteria" and "the evaluation criteria set forth in the solicitation," respectively.  Similarly, paragraph (c) requires that "the competitive range . . . consist of ViroMed and CDD," which only has meaning within the context of the RFP.  Requiring a new TEB to evaluate "the existing proposals of Viromed and CDD," in paragraph (d), the Dismissal Order highlights that those proposals comprise the parties' responses to the RFP at issue in *ViroMed I*, i.e., "the initial technical proposals; communications from CDD and ViroMed . . . ; and the revised proposals of August 2008." Ordering

the new contracting officer to hold discussions with the parties on innovations, the lack of which plaintiff highlighted in its *ViroMed I* Complaint ¶¶ 21, 44–47, similarly refers only to the parties' proposals responding to the RFP.  Thus, the opportunity to revise their proposals in paragraph (f), and the new staff evaluating those proposals in paragraph (g), refer only to the parties' specific proposals responding to the RFP.  None of these items refer to any action beyond the Navy's evaluation of the RFP in *ViroMed I* and the parties' proposals thereto.

The only provision of the Dismissal Order that could *possibly* extend beyond the RFP is paragraph (a), which orders the Navy to assign a new TEB, contract negotiator, and contracting officer "to the procurement."  Dismissal Order ¶ (a).  This argument, which the court raised *sua sponte*, primarily because plaintiff had not addressed the text of the Dismissal Order or the Consent Stipulation (*see* Tr. at 27–33), is that the term "procurement" is singularly broad, possibly extending beyond a particular solicitation,[11] and as such its use arguably cannot be limited to the RFP in *ViroMed I*.  *See Lublin Corp. v. United States*, 84 Fed. Cl. 678, 681–82 (2008) (quoting varying definitions of "procurement").  Yet this court must emphasize that the term "procurement" here is modified by the word "*the*," and thus the clear meaning is that the phrase "the procurement" refers *only* to *the* solicitation at issue in the Dismissal Order.

Consequently, items (a)–(h) of the Dismissal Order all specifically refer to procedures within the context of awarding a contract pursuant to one specific solicitation—the RFP in *ViroMed I*.  It would defy logic for the parties to have agreed on a number of specific actions that only apply to the RFP at issue in *ViroMed I* without specifically highlighting a provision that extended outside that context.  In other words, if one provision were to have an effect disproportionate to all of the others, its text would so indicate with a bang, not a whimper.

It is well-established that courts "must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (citing *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)); *see Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006); *NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996) (describing as a "settled principle of contract interpretation" that courts "view the contract as a whole"); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).  *See generally* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed. 1999).  This is merely another way of saying that

---

[11] *See* 41 U.S.C. § 403(2) ("The term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process of determining a need for property or services and ending with contract completion and closeout."); FAR 2.101(b)(2) (equating "procurement" with "acquisition," which "begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contract, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract"); *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989) ("the acquisition by purchase, lease or barter, of property or services for the *direct* benefit or use of the Federal Government" (emphasis in original)); XII THE OXFORD ENGLISH DICTIONARY 559 (2d ed.1998) ("[t]he action or process of obtaining by care or effort; acquisition, attainment, getting, gaining").

context defines a contract and the issues deriving thereof. Ergo, when interpreting a contract, its language must be given "the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999). Reading paragraphs (a) through (h) of the Dismissal Order together, each of which are items of equal rank in a list, thus can lead this court to only one conclusion—that each provision refers only to the RFP in *ViroMed I*.

This conclusion is buttressed by the underlying Consent Stipulation, the agreement between the parties on which the Dismissal Order rests.[12] The Consent Stipulation records the parties' collective intent that "pursuant to the parties' agreement, the Navy shall take corrective action *with respect to* RFP N00189-07-R-Z027 as follows . . ." (what follows are items (a) through (h) of the previously quoted Dismissal Order). Consent Stipulation at 1–2 (emphasis added). Obviously, the RFP in question, N00189-07-R-Z027, is the RFP in *ViroMed I*. Furthermore, attached to (and referenced by) the Consent Stipulation is the Declaration of Velma Corey, the Technical Director overseeing the RFP. She states therein that she had agreed to take the stipulated "corrective action," specifically referring to the contract awarded to CDD under the RFP, in other words, the RFP in *ViroMed I*. *See* Corey Decl. ¶ 3 ("I have decided . . . to take corrective action regarding the award of [CDD's contract under the RFP].").

Accordingly, contrary to plaintiff's contentions, neither the Consent Stipulation nor Ms. Corey's Declaration state that the Navy shall take corrective action regarding all future solicitations of HIV-1/2 testing services. Rather, the Navy's corrective action is, by both its text and its context, limited to the specific RFP and contract at issue in *ViroMed I*.

Plaintiff has provided no evidence (let alone clear and convincing evidence) that the Navy and defendant agreed, and that this court ordered, that the Navy is not to involve Ms. Mezzatesta and Ms. Hanger in any solicitation relating to HIV-1/2 testing services. What is more, plaintiff's counsel conceded at oral argument that the parties neither contemplated nor discussed the award of a bridge contract for HIV-1/2 testing services at the time they entered into the Consent Stipulation. (Tr. at 27). It is, therefore, abundantly clear from its own text, and buttressed by the Consent Stipulation and Corey Declaration, that the Dismissal Order only applies to the RFP, and does not purport to cover all present and future acquisitions of HIV-1/2 testing services.[13]

---

[12] Because "[t]he scope of the [settlement] transaction cannot be extended by implication," this court must "harmonize all parts of the [Consent Stipulation] and give it effect as a whole." *See* 15A C.J.S. COMPROMISE & SETTLEMENT § 30.

[13] As shown above, there is no ambiguity as to the Dismissal Order. *See W & F Bldg. Maint. Co. v. United States*, 56 Fed. Cl. 62, 69 (2003) ([B]efore "making a conclusive determination about an agreement's ambiguity, or lack thereof, the court should consider the context in which the agreement was executed"). Nevertheless, even assuming hypothetically that the term "procurement" in the Dismissal Order can refer to a procurement process outside the confines of the RFP in *ViroMed I*, it at best would create an ambiguity. *See* 15A C.J.S. COMPROMISE & SETTLEMENT § 31 ("[A]mbiguity exists in a settlement agreement when the language is reasonable capable of being understood in more than one sense."). This hypothetical ambiguity, however, is woefully insufficient to persuade this court that defendant is clearly and convincingly wrong about the scope of the corrective action in the Dismissal Order. *See Navajo Nation*, 7 Fed. App'x at 955.

**B. Plaintiff's Request for a Preliminary Injunction**

Having established that defendant did not violate the Dismissal Order, this court now turns to plaintiff's pending Application for a Preliminary Injunction. Initially, plaintiff asked this court to "enjoin[] the [Navy], from awarding a contract for HIV testing services pursuant to [the RFQ], until the resolution of [p]laintiff's [c]omplaint." Pl.'s App. at i. As recounted above, plaintiff now understands that the Navy awarded the bridge contract to CDD and, accordingly, asks this court to enjoin CDD's future performance for the month of June, thereby requiring the Navy to award another one-month "extension" to plaintiff's existing contract. (Tr. at 42, 68–70, 91); Pl.'s App. at 14.

As always, plaintiff carries the burden of establishing its entitlement to a preliminary injunction. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *Labatt Food Serv., Inc. v. United States*, 84 Fed. Cl. 50, 64 (2008) (citing *U.S. Ass'n of Imps. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005)). To carry this burden, plaintiff must demonstrate that: (1) it will suffer immediate and irreparable harm if the court withholds preliminary injunctive relief; (2) the balance of hardships favors a preliminary injunction; (3) it is likely to succeed on the merits of its protest; and (4) a preliminary injunction is in the public interest. *FMC Corp.*, 3 F.3d at 427. In the court's analysis "[n]o one factor, taken individually, is necessarily dispositive." *Id.* In other words, "the weakness of [plaintiff's] showing regarding one factor may be overborne by the strength of the others." *Id.*

### 1. Immediate and Irreparable Harm

Plaintiff argues that unless this court issues a preliminary injunction, it will lose its opportunity to compete on a "fair and lawful basis" for the estimated $[redacted] bridge contract, and therefore also lose the "substantial profits it would have made under the contract." Pl.'s App. at 11; (Tr. at 65). Defendant counters that whatever lost profit plaintiff may suffer on the bridge contract is mitigated and offset by the profits plaintiff received under its previous five-year contract, plus the two one-month extensions—each essentially representing a sole-source award. (Tr. at 81).

This court declines defendant's invitation to consider prior profits under previous contract awards. Standing alone, the loss of an opportunity to fairly compete on future government contracts constitutes irreparable harm. *Rhinocorps Ltd. Co. v. United States*, No. 08-410C, 2009 WL 1362843, at *6 (Fed. Cl. May 15, 2009). This is because "[a]n action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits.'" *Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 730 (2004) (quoting *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl. Ct. 277, 287 (1983)), *aff'd*, 404 F.3d 1346 (Fed. Cir. 2005); *see* 28 U.S.C. § 1491(b)(2) (limiting this court's ability to award monetary relief in bid protests "to bid preparation and proposal costs"). Because plaintiff would suffer the loss of anticipated profits, this court holds that plaintiff has established that it would suffer immediate and irreparable harm should this court not issue the proposed preliminary injunction.

### 2. Balance of Hardships

In order to ensure continuous HIV testing services for the duration of the proposed injunction, plaintiff asserts that the Navy can simply issue another one-month "extension" to

plaintiff's existing contract for the month of June, just as the Navy issued plaintiff extensions for April and May. (Tr. 42, 68–70). Defendant argues that plaintiff is proceeding under a false premise and instead maintains that it exercised all of the available option periods under plaintiff's contract, which expired on March 31, 2009. Def.'s Resp. at 2; (Tr. at 78). Defendant states that the "extensions" to which plaintiff refers are, in fact, sole-source awards with accompanying written justifications. Def.'s Resp. at 2; (Tr. at 78–79). Thus, any "extension" for June would have to be a separate procurement and thus an award subject to protest by CDD, thereby occasioning further delay and inconvenience in the provision of HIV testing services for our service members. Def.'s Resp. at 2; Hanger Decl. ¶ 5; (Tr. at 60–61).

This court does not have the benefit of having plaintiff's previous contract before it—only the contracting officer's declaration that it expired in March and that the two "extensions" were sole-source awards. Hanger Decl. ¶ 3. Plaintiff has not submitted any evidence to the contrary. Accordingly, this court finds that plaintiff's contract expired in March and that the Navy is unable to simply issue an "extension" to plaintiff for the month of June.

Whatever the current state of plaintiff's contract, defendant offers an even more compelling reason why plaintiff cannot provide HIV testing services for the month of June—there is not enough time to notify all Navy activities (i.e., all units and installations) of the switch in HIV testing providers. Def.'s Resp. at 8–9. According to the declaration of CDR Adam W. Armstrong,[14] the Navy has already notified all activities that HIV testing would be performed by CDD as of June 1, 2009. Armstrong Decl. ¶ 10. The Navy needs a minimum of ten days to notify activities ashore and at sea of where they are to send service members' blood samples for testing. Armstrong Decl. ¶¶ 5, 11. If activities fail to receive the change notification ten days in advance, blood samples may be sent to the wrong testing center and expire in transit. Armstrong Decl. ¶¶ 4–8. In CDR Armstrong's opinion, "[e]ach day of delay [in notification] creates an undue risk to the Navy's [HIV testing] program." Armstrong Decl. ¶ 11. CDR Armstrong's testimony stands unrebutted, except by plaintiff's counsel's unsubstantiated arguments.

Absent extraordinary circumstances, delay in reprocurement alone does not merit the denial of injunctive relief. *See Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000) ("'[O]nly in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the court would never grant injunctive relief in bid protests.'" (quoting *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999) (second alteration in *Overstreet*))). Even so, these *are* extraordinary circumstances. *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 656 (denying injunctive relief where "the product being acquired is critical to protect the nation's aircrew against chemical, biological and nuclear threats"). When hearing a bid protest, this court must "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3); *see Gentex*, 58 Fed. Cl. at 655 ("The Tucker Act requires that the Court consider the interest of national defense in its bid protest decisions."). Here, plaintiff seeks injunctive relief that would necessarily affect service member health and military readiness at a time when our nation is engaged in not one, but two conflicts abroad. Armstrong Decl. ¶ 11. Accordingly, this court finds that the balance of hardships favors defendant and the withholding of preliminary injunctive relief. *See Gentex*, 58 Fed.

---

[14] CDR Armstrong is a physician and manages the Navy's HIV testing program. Armstrong Decl. ¶ 1.

Cl. at 656 ("The form of injunctive relief which would remedy the errors in this procurement—the issuance of an amendment to the RFP, a new round of FPRs, a new evaluation with a possible new awardee, and perhaps resultant termination costs and transition delays—would necessarily substantially delay performance. It is the judgment of this Court that this critical procurement cannot tolerate such disruption and delay.").

### 3. Likelihood of Success on the Merits

Plaintiff's lone claim for relief is that Navy contracting officials violated FAR 3.101. *ViroMed II* Compl. at 7. FAR 3.101-1 provides that "[g]overnment business shall be conducted in a manner above reproach . . . with complete impartiality and with preferential treatment for none." In other words, plaintiff complains that the Navy harbored ill-will toward plaintiff and accorded CDD preferential treatment. *ViroMed II* Compl. 7–8; Pl.'s App. 12–13.

This court reviews bid protest actions under the standard of review set forth at 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Accordingly, for a protestor to ultimately succeed on the merits, it must show by a preponderance of the evidence that the agency's contracting action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Rhinocorps*, 2009 WL 1362843 at *4. However, where as here, the protestor alleges that government procurement officials acted in bad faith, it must then prove those allegations by clear and convincing evidence.[15] *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002). "This higher standard of proof is required in order to overcome the long-standing presumption that government officials act in good faith and in the public interest when carrying out their public duties." *Carahsoft Tech. Inc. v. United States*, 86 Fed. Cl. 325, 337 (2009) (citing *Am-Pro Protective Agency*, 281 F.3d at 1239).

Plaintiff's account of the facts leading up to this protest does not materially conflict with defendant's. *Compare* Fogerson Decl. (Declaration of Vice President of ViroMed), *with* Hanger Decl. (Declaration of Navy Contracting Officer). The parties only differ as to what these facts portend. Plaintiff argues that the Navy's third and final amendment to the RFQ can only be interpreted as an effort to pry the bridge contract from plaintiff and award it to CDD. Pl.'s App. at 12–13; (Tr. at 50). Plaintiff contends that:

> [o]nce the Navy realized that ViroMed was the only offeror capable of performing HIV-1 testing . . ., it abruptly changed its position and alleged that HIV-1/2 testing was in the Navy's best interest. This pattern of conduct reveals that the Navy is grossly biased in favor of CDD, and will go to extreme and unlawful lengths to ensure CDD is awarded this contract.

---

[15] Plaintiff's counsel appeared somewhat confused on this point at the hearing, initially asserting that plaintiff had only to meet a "preponderance standard." (Tr. at 48). Eventually, counsel proffered: "[I]f you're asking me to tell you why we can meet a clear and convincing standard, if that's what you want to apply, then I will." (Tr. at 50).

Pl.'s App. at 13. This argument merely piles inference upon inference, creating a syllogism of speculation.

By contrast, defendant proffers at least two reasons why the third amendment does not necessarily imply bad faith. First, defendant asserts that the amendment was merely an effort to encourage competition after the Navy learned that ViroMed had cornered the market on HIV-1 testing. *See* Def.'s Resp. at 7 ("[The contracting officer] was simply doing her job: researching the marketplace and making sure that the Navy was meeting its responsibility of fostering competition in procurements."); (Tr. at 81–86). Second, defendant argues that the contracting officer had reasonable concerns, based on the conflicting information that she received, about whether *any* offeror could provide HIV-1 testing services for the month of June, whereas there was no question about the availability of HIV-1/2 testing. (Tr. at 76–77).

To be sure, government procurement officials are charged with fostering competition among contractors. *See* 10 U.S.C. § 2304(a)(1)(A) (titled "Contracts: competition requirements"); FAR 6.101(a) ("[C]ontracting officers shall promote and provide full and open competition in soliciting offers and awarding [g]overnment contracts."). Specifically, contracting officers are to "develop specifications in such manner as is necessary to obtain full and open competition with due regard to the nature of the property or services acquired." 10 U.S.C. § 2305(a)(1)(A)(iii).

In the instant case, the contracting officer awarded two sole-source extensions to plaintiff's expired contract for HIV-1 testing. Hanger Decl. ¶ 3. These sole-source awards were necessary until the contracting officer could conduct a competitive procurement for the bridge contract. *Id.* When the contracting officer finally could issue a competitive solicitation for the bridge contract, she did not question the availability of HIV-1 testing kits, nor the ability of plaintiff and CDD to compete for the contract. Hanger Decl. ¶¶ 3–4. Once "[plaintiff] advised the Navy that Bio-Rad, the only manufacturer of the required test kits, would not have HIV-1 test kits available beyond June 2009," the contracting officer attempted to salvage the RFQ by amending it to include HIV-1 testing only through June 2009, and HIV-1/2 testing beyond. *Id.*

On May 15, 2009, plaintiff submitted its quotation in response to the amended RFQ with a cover letter advising the Navy that it had "purchased the existing stock of . . . HIV-1 test kits required by the [s]olicitation." Pl.'s Ex. 3. However, at that time, the contracting officer also had on hand a quotation from CDD providing a price for HIV-1 testing services. Hanger Decl. ¶ 4. Given this conflicting information, the contracting officer abandoned the requirement for HIV-1 testing altogether, in favor of HIV-1/2 testing. Hanger Decl. ¶ 4.

Clearly, the limited supply of HIV-1 testing kits meant that plaintiff and CDD could not truly compete on the bridge contract if the RFQ retained the HIV-1 testing requirement. In the contracting officer's words, moving from HIV-1 testing to HIV-1/2 testing "promote[d] competition in compliance with CICA and the FAR."[16] *Id.* The contracting officer also cited the fluctuating nature of the Navy's requirements for HIV testing and the "risk that there would not be [a] sufficient

---

[16] Moreover, the HIV-1/2 test is a more-than-capable substitute for HIV-1 testing alone. *See* BIO-RAD, MULTISPOT HIV-1/HIV-2 RAPID TEST 3 (2004), http://www.fda.gov/cber/pmalabel/p040046LB.pdf.

quantity of HIV-1 [tests] available for the entire month of June," despite plaintiff's representations otherwise.[17] *Id.*

The contracting officer's proffered concerns strike this court as creditable and entirely reasonable. Plaintiff's characterizations of the contracting officer's motives is nothing more than sheer conjecture. As noted above, plaintiff's only claim is that the contracting office acted in bad faith. *ViroMed II* Compl. at 7–8. But when asked to identify the evidence of bad faith in the record, plaintiff's counsel could not. (Tr. at 52). Instead, plaintiff's counsel merely repeated the facts on which all the parties essentially agree. (Tr. at 53–54). But any implications that plaintiff draws from these facts falls far short of clear and convincing evidence. Given this elevated burden of proof, the court cannot conclude that plaintiff is at all likely to succeed on the merits of this bid protest.

### 4. Public Interest

"[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440 (1944). The above quote summarizes the instant case well. Given plaintiff's low likelihood of success on the merits and the potential impact that such an injunction would have on service member health and military readiness in a time of conflict, this court must deny plaintiff's motion for a preliminary injunction.

### IV. CONCLUSION

Accordingly, plaintiff's application for a preliminary injunction is **DENIED**. Plaintiff's motion for contempt is also **DENIED.**

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*
**Lawrence J. Block**
**Judge**

---

[17] Plaintiff complains, at length, that the Navy should have confirmed plaintiff's ability to provide HIV-1 testing services for the month of June before removing the HIV-1 requirement from the RFQ. (Tr. at 30, 46–47, 58, 61–62). However, plaintiff has not cited any legal authority for this proposition, nor explained why the lack of confirmation necessarily implies bad faith.